**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13 CR 339 |
| v. ) | |
| ) | Judge Rebecca R. Pallmeyer |
| JOHN TERZAKIS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

A federal grand jury in the Northern District of Illinois returned a five-count indictment against Defendant John Terzakis on April 25, 2013. Each of the five counts alleged that Defendant transported across state lines more than $5,000 he knew to be stolen, in violation of 18 U.S.C. § 2314. These charges were based on allegations that Defendant had stolen funds from the estate of a deceased business partner, Berenice Ventrella. The government sought to recover approximately $2.5 million it claims was stolen from Ventrella. In October 2015, the government learned that a critical witness, Nicholas "Nick" Ventrella (Berenice's son) (hereinafter, "Nick"), had been diagnosed with a brain tumor and given just six months to live. Prosecutors shared this information with the Defendant, and the parties entered plea negotiations that ultimately proved fruitless. In January 2016, Terzakis demanded a trial; citing the unavailability of a key witness, the government conceded it could not proceed and dismissed the charges.

Terzakis now claims that the government's justification for dismissal "**is a lie**." (Def.'s Reply [63] at 2 (emphasis in original).) Defendant contends that the indictment was an unsuccessful attempt to strong-arm him into cooperating in another case, and that the government never actually intended to call Nick, whom the indictment described as suffering from "longstanding cognitive disabilities." Based on these assertions, Defendant has moved to

recover his attorney's fees pursuant to the Hyde Amendment, 18 U.S.C. § 3006A, which allows for fee shifting where the government's prosecution of an individual was "vexatious, frivolous, or in bad faith." To obtain evidence he believes would support that motion, Terzakis has also asked the court to order the disclosure of the grand-jury materials related to the indictment in this case. The government objects to both the release of the grand-jury materials and Defendant's fee motion. For the reasons set forth below, the court concludes that the government's prosecution of Terzakis does not trigger the fee-shifting provision of the Hyde Amendment. Defendant's motion for attorney's fees [51] is therefore denied. As the grand-jury materials are not necessary for the court's analysis, Defendant's motion to disclose those materials [57] is also denied.

## BACKGROUND

### I. Factual history

Most of the facts underlying this case are not in dispute. Until her death in 2008, Berenice Ventrella served as trustee for a family trust with extensive real estate holdings. (Ex. 1 to Gov't's Resp. [60] at 1.) Berenice met Defendant John Terzakis—the owner of a property-management company that managed some of her companies—in the early 1990s. (*Id.* at 2.) Shortly before her death, Berenice signed a document, created at Terzakis's behest, appointing her son Nick the successor trustee for the Ventrella trust. (*Id.* at 3.) The appointment agreement required that any significant decisions regarding the trust would be made with Terzakis's advice and consent. (Ex. 7 to Gov't's Resp. at 86-88.)

This case relates to a particular parcel of land owned by Berenice. Known as the Milwaukee Deerfield North property, the vacant plot abuts two of the four corners of Milwaukee Avenue and Deerfield Road in Buffalo Grove, Illinois. In March 2007, Defendant and Berenice formed an LLC to hold the property, giving Terzakis a 75% interest in the LLC and Berenice 25%. The LLC purchased the property, which had been owned by Berenice, using a $15 million loan from the Parkway Bank.

2

Two months after Berenice died, Terzakis opened a new account at Parkway in the name of "Estate of Berenice Ventrella."  Terzakis, Nick, and Berenice's husband, Angelo, were named as signatories.  (Ex. 6 to Gov't's Resp. at 1491-94.)  This is where the parties' accounts begin to diverge.  According to the government,

> Terzakis then took Nick to various banks and caused Nick to move funds totaling approximately $5.4 million out of Berenice's accounts into the Estate account.  Terzakis told Nick—who was still the trustee for Berenice's estate and therefore responsible for the Estate account—that he needed to pay for the property's development. . . .  Between March and September 2008, Terzakis transferred approximately $4.2 million from the Estate account to the Milwaukee Deerfield North account.  Terzakis then transferred substantial amounts of those funds to other accounts he held, for purposes that had nothing whatsoever to do with development of Milwaukee Deerfield North.  He had stolen the money based on false representations to Nick about the purpose of the transfers.

(Gov. Resp. at 3.)  The government claims that these facts are based, in part, on its interviews with Nick, who said that he had not authorized Terzakis to take the money for any purpose other than the development of the Milwaukee Deerfield North property.  (*Id.* at 3-4.)

Terzakis has a different account of how he obtained these funds.  According to him, the money *was* used to develop the property.  But, he argues, what he did with the money is irrelevant, because it was loaned to him by Berenice's Estate.  (Def.'s Mem. [53] at 7.) Defendant claims that Nick, who has been diagnosed as autistic, was misled and coached into telling a false story to the FBI by government agents and by Joseph Santucci and Joseph Ventrella—Nick's cousin and brother, respectively.  (*Id.* at 5.)  The two men came to the FBI's Chicago office on March 16, 2010 "to report a theft from the Berenice Ventrella Revocable Trust."  (FBI 302, Ex. 7 to Vol 3, Def.'s Merits Reply [69].)  According to Terzakis, Santucci and Joseph Ventrella were lying to the FBI in order to get some of the fortune that Berenice left behind.  (Def.'s Reply at 3 n.2 ("After Berenice's death, Joseph Santucci came up with a plan to regain the vast fortune that his mother had been disinherited from receiving.  The plan included manipulation of the Ventrella brothers . . . and making false allegations against John Terzakis, who stood as an obstacle to Santucci's plan . . . .").)

3

During that meeting, Santucci provided the FBI with a medical evaluation[1] of Nick performed by Dr. Karen Levin, dated August 19, 2009. (Levin Report, Ex. 2 to Def.'s Grand Jury Reply at 3.) Nick was 67 at the time of Dr. Levin's evaluation.

Terzakis proffered in September 2010, while under federal indictment in California on charges arising from an unrelated $24 million Ponzi scheme. (Terzakis 302, Ex 17 to Vol. 3, Def.'s Merits Reply.) Terzakis pleaded guilty to those charges and faced a Guidelines sentence of 188 to 235 months. The court imposed a sentence of just 84 months, well below the guideline, based, in large part, on his significant restitution efforts in that case. (Def.'s Mem. at 10 n.10.) During his proffer, Terzakis shared his version of events regarding the millions of dollars removed from the Estate account in 2008. According to the three agents that conducted the proffer, Terzakis stated that he took Nick and Angelo to multiple banks where Berenice maintained accounts and transferred all of her money into a single account at Parkway Bank in the name of "Estate of Berenice Ventrella." (Terzakis 302 at 2-3.) When asked about the money removed from the Estate account, Terzakis "responded that he took a loan from the Ventrella family. The loan was for 'working capital.'" (*Id.* at 3) He told the agents that the loan ledger and other documents related to the loan could be found in the Willowbrook, Illinois office of his real estate company, Single Site Solutions. He drew a map pointing the government to the documents' location in the office. (*Id.*) In reality, the government had already searched the office and recovered the ledger.

The government contends that it offered Terzakis a "global resolution" to both this case and his California indictment. (Gov't Resp. at 8.) Defendant and his California attorney "have a different recollection." (Def.'s Merits Reply at 23.) His California-based lawyer, who represented Defendant from April 2011 to May 2013, says that "At no time during that period of time had anyone mentioned an offer for a global resolution of the two cases. We had no idea a

---

[1] Terzakis claims that Dr. Levin's evaluation was performed at the behest of Santucci who hoped to use it as evidence to support Nick's ouster as trustee. (Def.'s Merits Reply at 8.) The government does not discuss the provenance of the evaluation.

4

second case existed prior to Mr. Terzakis' arrest [on the Chicago charges on April 26, 2013]." (Diamond Decl., Ex. 18 to Vol 3, Def.'s Merits Reply.)

Terzakis pleaded guilty to the California charges in February 2012. He was sentenced in the Northern District of California on September 27, 2012. In April 2013, before Terzakis's surrender date in that case and just days after Defendant had undergone back surgery, a federal grand jury in the Northern District of Illinois returned an indictment charging Defendant with five counts of violating 18 U.S.C. § 2314. The Chicago indictment also sought criminal forfeiture in the amount of $2,437,233.00. Since his April 26, 2013 arrest, Terzakis has remained in custody and is currently serving the sentence imposed by the Northern District of California.

In October 2015, prosecutors learned that Nick was terminally ill and had approximately six months to live. They disclosed these circumstances to Defendant, and the parties entered into plea negotiations. With Terzakis already incarcerated, the parties reached a tentative agreement that contemplated a guilty plea to a single violation of § 2314, and would have exposed Defendant to no additional prison time and to payment of $250,000 in restitution. (Ex. 5 to Def.'s Grand Jury Reply [63].) But Terzakis chose to reject the offer on December 23, 2015 and demanded a speedy trial. The government moved to dismiss the case due to Nick's unavailability on January 8, 2016, and the court entered a dismissal order [49] later that day. Terzakis now moves to recover attorney's fees under the Hyde Amendment on January 5, 2016 [51].

## **DISCUSSION**

### **I.     Hyde Amendment**

Defendant seeks to recover attorney's fees under the so-called Hyde Amendment[2], named for its sponsor, Illinois Congressman Henry Hyde. The Amendment authorizes the

---

[2]     This Amendment is not to be confused with the 1976 amendment, named after the same legislator, which barred, with limited exceptions, the use of federal funds to pay for

award of attorney fees to a "prevailing party" who was the subject of a federal prosecution that was "vexatious, frivolous, or brought in bad faith." 18 U.S.C. § 3006A. A party seeking to recover fees "must establish by a preponderance of the evidence that the government's position was vexatious, frivolous, or in bad faith." *United States v. Truesdale*, 211 F.3d 898, 908 (5th Cir. 2000); *see also United States v. Campbell*, 291 F.3d 1169, 1171 (9th Cir. 2002) ("[Defendant] bears the burden of proof, as well as establishing that he is otherwise qualified[3] for the award under the law." (internal quotation marks omitted)).

### A. Terzakis is a "prevailing party" for purposes of the Hyde Amendment

The government contends that Terzakis is not a "prevailing party" because "[he] received no relief on the merits. No judge or jury acquitted him of the charges in the indictment, and he has not been found to be innocent." (Gov't's Resp. at 13.)

Whether a party is "prevailing" for purposes of the Hyde Amendment is a threshold question. *United States v. Sriram*, 482 F.3d 956, 959 (7th Cir. 2007) ("[E]ven if the government's position is vexatious, etc., the defendant cannot be awarded fees unless he is the prevailing party."), *vacated on other grounds*, 552 U.S. 1163 (2008). The Amendment does not define this key term. It does, however, provide that "awards [of attorney's fees] shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code [the Equal Access to Justice Act ("EAJA")]." 18 U.S.C. § 3006A Note. In fact, the Hyde Amendment was modeled after the EAJA.[4]

---

abortions. 90 Stat. 1418 (1976); *see also Harris v. McRae*, 448 U.S. 297 (1980) (upholding the constitutionality of the abortion-related Hyde Amendment).

[3] In addition to establishing that the government's position was vexatious, frivolous, or in bad faith, a defendant must also meet the additional qualifications for fee awards set forth in the Equal Access to Justice Act, 28 U.S.C. § 2412. *See United States v. Knott*, 256 F.3d 20, 27 (1st Cir. 2001) ("The district court was correct to require fee applicants to meet the eligibility requirements of EAJA § 2412(d)."). For instance, the individual's net worth must not exceed $2 million at the time of the indictment. *Id.* § 2412(d)(2)(B)

[4] "We have a law called the Equal Access to Justice Act, which provides in a civil case if the Government sues you, and you prevail, if the Government cannot prove substantial

6

Accordingly, courts have looked to EAJA cases for guidance in determining whether a party has "prevailed." *See id.* ("For the general principle [of who is a prevailing party], *see Farrar v. Hobby*, 506 U.S. 103, 111-14 (1992) ('the prevailing party inquiry does not turn on the magnitude of the relief obtained,' *id.* at 114), and *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Resources*, 532 U.S. 598 (2001), and for its application to the Hyde Amendment[,] *see United States v. Campbell*, 291 F.3d 1169, 1171-72 (9th Cir. 2002), and *United States v. Beeks*, 266 F.3d 880, 883 (8th Cir. 2001) (per curiam).").

In the civil context, a "prevailing party" is generally "one who is granted some relief by the court, concerning a significant issue in the litigation, by either a judgment on the merits or a court-ordered consent decree." *See Buckhannon*, 532 U.S. at 602; *see also* BLACK'S LAW DICTIONARY 1154 (8th ed. 2004) (defining "prevailing party" as the "party in whose favor a judgment is rendered, regardless of the amount of damages awarded"). That is, one prevails only if the outcome leads to a "material alteration of the legal relationship of the parties." *See Buckhannon*, 532 U.S. at 602.

Mapping this principle onto the criminal context is not a perfect fit. An acquitted defendant is certainly a prevailing party, and a convicted one is not. *Sriram*, 482 F.3d at 959 ("A defendant who is convicted and sentenced is not the prevailing party even if the sentence is light.") But courts have struggled to agree on where to draw the line between those two outcomes. For instance, a defendant has been found to be a prevailing party where, like here, the government voluntarily dismissed the charges against him. *United States v. Knott*, 106 F. Supp. 2d 174, 177 (D. Mass. 2000), *reversed on other grounds*, 256 F.3d 20 (1st Cir. 2001) (reversing because the district court applied an incorrect legal standard for determining vexatiousness); *United States v. Gardner*, 23 F. Supp. 2d 1283, 1291 (N.D. Okla. 1998) (finding

---

justification in bringing the suit, you are entitled to have attorney's fees and costs reimbursed. . . . Now, it occurred to me, if that is good for a civil suit, why not for a criminal suit?" 143 Cong Rec H 7786 (1997) (statement of Rep. Hyde).

that defendant "won the relief that he sought" and was, therefore, a prevailing party where "there were charges not pursued, changes in charges, and dismissals both with and without prejudice piece by piece"). On the other hand, the Ninth Circuit has held that a defendant did not prevail where a district court declared a mistrial based on the government's *Brady* and *Giglio* violations. *United States v. Chapman*, 524 F.3d 1073, 1089-90 (9th Cir. 2008). The *Chapman* court determined that, because "the relief was not based on the *merits* of the case" and the Double Jeopardy Clause did not prohibit retrial, the dismissal did not "materially alter[] the legal relationship of the parties." *Id.* at 1089 (emphasis in original); *see also Oscar v. Alaska Dep't of Educ. & Early Dev.*, 541 F.3d 978, 981 (9th Cir. 2008) (holding that dismissal without prejudice did not alter the legal relationship of the parties under the Individuals with Disabilities Education Act, another fee-shifting statute).

In this court's view, even under the Ninth Circuit's standard, Defendant has "prevailed." Unlike in *Chapman*, the charges against Terzakis were time-barred when dismissed.[5] This distinction is an important one: In *Cadkin v. Loose*, a copyright case, the Ninth Circuit held that "a defendant is a prevailing party following dismissal of a claim if the plaintiff is judicially precluded from refiling the claim against the defendant in federal court," because the defendant is no longer "subject to the risk" associated with the claims raised in the suit. 569 F.3d 1142, 1150 (9th Cir. 2009). Similarly, the government's dismissal of the charges against Terzakis at this stage precludes the prospect that he might face criminal liability for the actions alleged in the indictment. Although the relief Terzakis obtained was not necessarily based on the merits, the result was a material alteration of the legal relationship of the parties. That is enough to render Defendant a prevailing party.

---

[5] The statute of limitations for each count in the indictment was five years, 18 U.S.C. § 3282, and the most recent activity alleged in the indictment occurred in 2008. (See Indictment at 5.)

8

### B. The government's prosecution of Terzakis was not vexatious, frivolous, or in bad faith

Like the term "prevailing party," the standard for determining whether the government's "position" was "vexatious, frivolous, or in bad faith" is also not explained in the statute. Those words, therefore, "must be given their ordinary meaning." *Chapman v. United States*, 500 U.S. 453, 462 (1991). Although the Seventh Circuit has not yet addressed the merits of a Hyde Amendment claim, other courts of appeals have weighed in. Based on dictionary definitions and Supreme Court caselaw, the Eleventh Circuit offered the following definitions for the Amendment's key terms:

> "Vexatious" means "without reasonable or probable cause or excuse." BLACK'S LAW DICTIONARY 1559 (7th ed.1999); *see also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) (describing "vexatious" conduct in the Title VII context as being "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith"). A "frivolous action" is one that is "groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant." BLACK'S LAW DICTIONARY 668 (6th ed.1990); *see also* FED. R. CIV. P. 11. Finally, "bad faith" "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." BLACK'S LAW DICTIONARY 139 (6th ed.1990); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978) (defining bad faith in the law enforcement context to include "reckless disregard for the truth").

*United States v. Gilbert*, 198 F.3d 1293, 1298-99 (11th Cir. 1999). The Ninth Circuit has adopted the same definitions of "frivolous" and "bad faith." *United States v. Manchester Farming P'ship*, 315 F.3d 1176, 1182-86 (9th Cir. 2003). Its interpretation of "vexatious" differs slightly, however, by adding a subjective element: "the Government must have acted maliciously or with an intent to harass."[6] *Id.* at 1182-83.

---

[6] This definition may be more consistent with Representative Hyde's own description of his Amendment, which he indicated was designed for situations where

> [U]ncle Sam . . . charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong. They keep information from you that the law says they must disclose. They hide information. They do not disclose exculpatory information to which you are entitled. They suborn perjury.

9

There is significant overlap between the courts' interpretations of these three terms. In fact, it would be difficult to craft a set of definitions that does not resort to redundancy among the three.[7] Taken together, however, they make clear that in order for a defendant to recover fees under the Hyde Amendment, Congress intended far more than a showing that he prevailed on the merits of his case. *See Gilbert*, 198 F.3d at 1299. ("[A] defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct.") Rather, the defendant must show either that the government's position was unintentionally baseless or, more damningly, that the prosecution acted with dishonest purpose.

### 1. The government's position was neither "vexatious" nor "frivolous"

Terzakis claims that the government's conduct in seeking the indictment against him was both "vexatious" and "frivolous." Understandably, given the similarity between the two applicable standards, his arguments in favor of both contentions are largely overlapping. The court will, therefore, assess these arguments together, keeping in mind that, under any definition of these terms, Terzakis must at least show that the government's actions were baseless.

Defendant suggests that the government's allegations "depended entirely" on (1) Nick's claim that Terzakis had said "he was transferring money to the Milwaukee Deerfield North account to pay for developments to the Milwaukee Deerfield North property"; and (2) the government's contention that "Milwaukee Deerfield North property was not developed." (Def.'s Mem. at 13.) This approach was problematic, according to Defendant, for three reasons:

> (1) Nick Ventrella was obviously an essential witness, but Nick Ventrella had longstanding cognitive disabilities and lacked rational thought, since at least 2009 (more than three years before the indictment was requested from the grand jury); (2) a large volume of credible evidence in the government's possession since

---

143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997).

[7] Vexatious and frivolous are essentially synonyms under the Eleventh Circuit's (and Black's) definitions (i.e., the prosecution's actions were baseless). The Ninth Circuit's addition of a subjective element to vexatiousness, meanwhile, renders it synonymous with "bad faith," both of which require not only a baseless prosecution, but one that was intentionally so.

10

June 2010 showed the Milwaukee Deerfield North property was substantially developed; and (3) the government possessed compelling evidence corroborating Terzakis' statement that the transactions were tied to a legitimate loan from the estate of Bernice Ventrella, secured by Terzakis' interest in Milwaukee Deerfield North, LLC.

(*Id.* at 15.) The record does not support any of these assertions.

First, Defendant's argument regarding Nick's cognitive abilities largely relies on mischaracterizations of the record. No one disputes that Nick was diagnosed as autistic (*see* Gov't Mem. at 1; Def.'s Merits Reply at 11), but Terzakis argues that Nick began to suffer from a new, unrelated "mental impairment" no later than August 2009, when Doctor Karen Levin noted in a report that Nick suffered from a "longstanding cognitive disability." (Levin Report at 3.) Without citation to any other authority, Terzakis claims that "Nick's mental impairment did not improve after Dr. Levin's examination on 8/19/2009, and it is very likely his cognitive impairment had deteriorated further by 2013 when AUSA Schneider first met Nick." (Def.'s Merits Reply at 11.) According to Defendant, "It was unreasonable and without substantial foundation for the government to base its entire case of 'fraud' on the incompetent and untrustworthy testimony of a single witness with longstanding cognitive disabilities." (Def.'s Mem. at 14.) Worse yet, Terzakis claims that, when it brought the indictment before the grand jury, the government "must have known Nick Ventrella would ***never*** testify, yet [it] concealed this from the grand jury . . . and asked for the indictment anyway." (Def.'s Merits Reply at 12.)

The government likely had no obligation to disclose Nick's cognitive disabilities to the grand jury. *See United States v. Williams*, 504 U.S. 36, 51 (1992) ("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). Yet, far from concealing Nick's cognitive limitations, the government cited them in the indictment, describing "Individual B" (i.e., Nick) as "suffer[ing] from longstanding cognitive disabilities." (Indictment ¶ 1(c).) Furthermore, there is no indication that Dr. Levin's assessment of Nick's cognitive state was referring to anything other than his autism. The rest of her entry on the subject actually

11

supports the opposite conclusion: "Mr. Ventrella clearly has a longstanding cognitive disability that would likely fall upon the autism spectrum. He certainly could be easily manipulated and is not rational in his thought. He should certainly have help with his finances, as well as other areas of living." (Levin Report at 3.) The court also notes that it can find no record evidence (and Terzakis cites to none) to support Terzakis's contention that Nick's condition "very likely . . . had deteriorated further by 2013." (Def.'s Merits Reply at 11.)

The government also claims that it "interviewed Nick multiple times" leading up to the indictment, "and the information he provided was lucid, highly relevant, and corroborated by the documents and other witnesses in the case." (Gov't's Resp. at 15.) But Terzakis argues that the government must be misrepresenting these interactions: "In light of the available medical evidence, there is no way [the government] reasonably could have found Nick 'lucid' and 'reliable' when [it] met him in 2013." (Def.'s Merits Reply at 12.) Again, however, he offers no support for this assertion beyond, apparently, Dr. Levin's report. Defendant suspects that Nick was, in reality, manipulated by the government and by Joseph Santucci, his cousin, who wanted to get a bigger cut of Berenice's Estate. But this story holds little water. If Defendant is correct that the government manufactured the charges, why did prosecutors create a case that relied on a witness that, according to Terzakis, the government knew was both lying and incapable of testifying at trial?

But Nick's condition is largely beside the point. The fact that Dr. Levin believed Nick "could be easily manipulated" and was "irrational" would have been fodder for cross examination, but it does not, as Terzakis implies, disqualify Nick as a witness. *See* FED. R. EVID. 601 ("Every person is competent to be a witness unless these rules provide otherwise."); *see also id.*, Advisory Committee Note ("No mental or moral qualifications for testifying as a witness are specified. Standards of mental capacity have proved elusive in actual application. [F]ew witnesses are disqualified on that ground. Discretion is regularly exercised in favor of allowing the testimony. A witness wholly without capacity is difficult to imagine. The question is

one particularly suited to the jury as one of weight and credibility.") (citation omitted). Nor does the government's reliance on him amount to impropriety. According to the government's theory of the case, Nick was the only person who knew about Defendant's dishonesty. The government was forced to choose between relying on Nick and declining to pursue charges against Terzakis at all. It was entitled to make either choice. Deciding on the former does not mean that the government's claims were baseless, nor does it establish that those claims were maliciously raised.

Terzakis's argument regarding the Milwaukee Deerfield North property's development is no more convincing. Defendant has provided a voluminous appendix—"literally thousands of documents" (Def.'s Mem. at 7)—that he claims proves that "the Milwaukee Deerfield North property was substantially developed." (*Id.* at 14.) But these documents, which include lease agreements, engineering surveys, and appraisals, do not establish that the property was developed by 2013 when the grand jury returned the indictment. The real disagreement between the parties here is the definition of "development." The government points out, and Terzakis concedes, that the property did not contain buildings or other structures in 2013.[8] (*See* Brian Lanners FBI 302, Ex. A to Vol. 2 (Proof of Development) to Def.'s Mem. ("On March 23, 2013, [Forensic Accountant ("FoA")] Brian Lanners observed property at the northwest and southwest corners of Milwaukee Road and Deerfield Road in Buffalo Grove, Illinois. FoA Lanners noted no evidence of development on either property.")). Terzakis nevertheless argues that, although the property remains vacant, "substantial development" had in fact occurred in the form of pre-construction development. As an expert witness who testified on behalf of Terzakis

---

[8] In fact, based on the court's own brief research, the parcel apparently remains vacant today. See Ronnie Wachter, Buffalo Grove Board To Discuss Incentives With Woodman's Food Market Following Building Tour, CHICAGO TRIBUNE (June 20, 2016), http://www.chicagotribune.com/suburbs/buffalo-grove/news/ct-bgc-woodmans-tour-tl-0623-20160620-story.html.

13

in his California case[9] put it, "commercial real estate development" involves several "stages": "identification of a site," "due diligence," and "construction," before, finally, "the tenant or tenants take possession and start paying rent." (Brandon Decl. Ex. B. to Vol 2. Def's Mem., ¶¶ 4-8.) These competing definitions would pose a question for the jury. This does not render the government's theory baseless, groundless, or otherwise without merit.

Moreover, as the government points out, the meaning of "development" would have been largely irrelevant here. The indictment alleges that "the vast majority of the money Terzakis took from the Estate" was used for purposes other than developing the Milwaukee Deerfield North Property. (Gov't's Resp. at 17.) Specifically, the government alleges that Terzakis "stole money . . . from the Estate . . . that was being held in the Milwaukee Deerfield North account, by transferring that money" to other accounts (Indictment ¶ 1(u)), where it was used to "pay expenses on his other ventures." (Gov't's Resp. at 17.) The government offers the following example to illustrate this pattern:

> [B]ank records show that on April 28, 2008, Terzakis transferred $750,000 from the Estate account to the Milwaukee Deerfield North account. On that same date, he then transferred $699,000 into his Midwest Properties account. Then, on that same date, he transferred almost that entire sum to five bank accounts held by Terzakis and to one individual recipient. From the five recipient bank accounts, four additional transfers were made on April 28, 2008 and May 1, 1008. None of these funds was used to develop the Milwaukee Deerfield North property.

(*Id.* at 8.)

This brings the court to Terzakis's third and final rationale for why the indictment was vexatious and frivolous: he asserts that the funds were actually a loan, not stolen from the Estate. To support this contention, Terzakis points to a "loan ledger" (Ex. 7 to Vol. 1, Def.'s Mem.) and claims that the government destroyed a "line-of-credit agreement" that would have supported his claim that the funds were loaned to him. (Def.'s Mem. at 10.) But neither of these are compelling. First, the loan ledger, which is handwritten, merely tracks the amounts that

---

[9] Brandon's declaration in the Northern District of California was related to commercial real estate development generally, not the development of the property in this case.

14

Terzakis withdrew. Terzakis claims that the ledger was "maintained by [his] employees" (*id.* at 8), but nothing about the document itself substantiates the notion that the funds were loaned to him. Nor is there any evidence to corroborate Terzakis's suggestion that the entries were made contemporaneously. The government's position is corroborated by the statements of two attorneys—one who represented Defendant, another who represented Berenice—both of whom had no knowledge of any such loan between Defendant and Berenice or her Estate. (Ex. 4 to Gov't's Resp.)

As for the "destroyed" evidence, Terzakis's memorandum is misleading. In it, he claims that his records at Single Site Solutions contained "documents securing the loan with Terzakis' interest in Milwaukee Deerfield North, LLC" and a "line-of-credit agreement created at the time of the loan." (*Id.*) He suggests that these documents were destroyed by the government. In support of this claim, Terzakis cites an October 2, 2014 email from FBI Forensic Accountant Brian Lanners stating, "According to SA Wunderli [in California], any records in the possession of San Jose['s FBI office] were pulped after their case was closed." (*Id.*) But the government provided additional context for this communication, which undercuts Defendant's theory that the government destroyed exculpatory evidence:

> In email exchanges in November and December 2014, defense counsel made clear that he was seeking specific records: "Regarding the California evidence, the only evidence I would be interested in is documents seized from the offices of Single Site in Chicago. If any such documents remain in the possession of FBI California, I'd like to review them." See Ex. 8, Dec. 4, 2014 email from Ray Shepard to AUSA. The U.S. Attorney's office responded with a detailed letter explaining that the records from Single Site Solutions had not been destroyed, but had been returned to a court-appointed receiver. See Ex. 8, Dec. 9, 2014 Letter from AUSA to Ray Shepard. The AUSA's letter not only explained and described the documents but also informed defense counsel whom to contact for further information. Id.

(Gov't's Resp. at 20-21.) It also strains credulity that sophisticated parties entering into an multi-million dollar loan would have created only one copy of their line-of-credit agreement. In short, neither the loan ledger nor the government's handling of evidence supports the notion that Terzakis's prosecution was baseless.

15

### 2. *The government's position was not "in bad faith"*

Terzakis also argues that the government's actions rise to the level of bad faith. He contends that this indictment was (1) a reprisal for what the government felt was too light a sentence that defendant received in the California case, and (2) the result of the government's "reckless disregard for the truth." (Def.'s Mem. at 16.) The latter claim requires little analysis, as it depends on the same arguments raised with regard to vexatiousness and frivolousness. The former is slightly more complicated.

Terzakis believes that the government indicted him in this case because it was unsatisfied with the light sentence he received in the California case. As evidence, he points out that the government delayed bringing the indictment until just after his surgery and just before the statute of limitations had lapsed. But neither of those circumstances smacks of bad faith. Indeed, indicting Terzakis before he underwent needed surgery might have been at least equally harsh, and there is, for good or ill, nothing unusual about indictments that occur near the expiration of the statute of limitations. Terzakis also points to the following email sent by Assistant United States Attorney Maggie Schneider to defense counsel during plea negotiations: "We won't do a binding C deal requiring concurrent time. You should be aware that we will explain that the judge in NDCA was not advised of this additional conduct, so we view the substantially below-guidelines sentence he received out there [as] a big benefit." (*Id.* at 15 n.13.)

Terzakis admits, however, that he "could find no case decisions finding bad faith based on prosecutor's belief that the defendant 'wasn't punished enough.' in a prior case." (Def.'s Mem. at 15.) This is not surprising. So long as a prosecution is based on probable cause, our system allows prosecutors to bring charges as they see fit. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to

prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Furthermore, similar motivations have been implicitly authorized by longstanding Supreme Court precedent. Take, for instance, dual state-federal prosecution. Under the Supreme Court's dual-sovereignty doctrine, both the state and federal government may prosecute an individual for the same conduct without violating the Double Jeopardy Clause. *Heath v. Alabama*, 474 U.S. 82, 88 (1985). Cases where the federal government brings charges only after a state jury has acquitted the defendant could give rise to an inference that the federal charges were brought based on a sense that the defendant "wasn't punished enough" in state court. Yet, such a prosecution is legitimate. *See, e.g.*, *United States v. Roman*, 608 Fed. Appx. 694, 694-95 (10th Cir. 2015). Nor is there anything unusual about declining to enter into a global deal to resolve two cases that have no apparent relationship to one another.

## II. Disclosure of grand-jury materials is unwarranted

Defendant has moved for the disclosure of grand-jury materials related to his indictment, which he claims "are relevant to the issues presented" in his motion for fees under the Hyde Amendment. (Pet. to Disclose Grand-Jury Materials [57] ¶ 5.) In his reply brief, Terzakis asserted, however, that his disclosure "request may be satisfied by providing access to the grand jury transcript of a single witness—Nick Ventrella—or by forcing the government to acknowledge, as Mr. Terzakis confidently predicts—that Nick Ventrella was never presented to the grand jury in this case." (Def.'s Grand Jury Reply [63] at 2.) In court on March 14, 2016, the government essentially conceded that Nick did not appear before the grand jury.

The Hyde Amendment provides for the disclosure of grand-jury materials in certain circumstances, but it does not entitle the moving party to discovery as a matter of right:

> To determine whether to award fees or costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might

17

reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal.

18 U.S.C. § 3006A; *see also United States v. Truesdale*, 211 F.3d 898, 907 (5th Cir. 2000) ("It is clear that the [Hyde] Amendment . . . does not provide for discovery or a hearing as a matter of right.").

Defendant has failed to show "good cause" for releasing the grand-jury materials here. Terzakis's sole, explicit purpose for disclosing the grand-jury materials is to establish Nick's presence or absence at the grand-jury proceedings. But the resolution of that issue is irrelevant to the court's analysis here. Nick's absence would not support Defendant's argument that "Nick Ventrella was *always* an unavailable witness to the government in this case." (Def.'s Grand Jury Reply at 2 (emphasis in original).) Because "an indictment may be based upon hearsay," *United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)), there was no requirement for the government to call Nick as a witness at the grand jury. And though the government concedes it will not be able to secure a conviction without Nick's testimony, the fact that he did not testify before the grand jury did not prevent the government obtaining an indictment. Defendant's motion to disclose the grand-jury materials in this case is denied.

## **CONCLUSION**

For the foregoing reasons, Defendant's motions for attorney's fees [51] and for the disclosure of grand-jury materials [57] are both denied.

ENTER:

Date: August 19, 2016

REBECCA R. PALLMEYER
United States District Judge